Good morning and welcome to the East panel. We have five panels, I think, sitting this week, three panels sitting in the morning and one in the afternoon, so it's a busy week as we close out the month of April. We have four cases on today. I think everybody's good and experienced. I'm honored to be sitting this week with Judge Edith Clement, a venerable federal district court judge before she came up here to spread all the wisdom of having been in the trenches doing the work, Judge Don Willett, who has an esteemed career on the Supreme Court of Texas, and I'm your other Louisiana judge here today, but it's a pleasure to have you. We have guests today. We have students in the audience from Metairie Country today. We don't normally have that many people in the courtroom for oral arguments. Contrary. Sometimes it's just the law clerks in here, so we're happy that you're here. We always welcome young people and any people having a greater understanding of our system, particularly the judicial branch. We tend to be a little more mystical than some of the other branches, but this is real world. These are real cases, great lawyers, and so we're honored that you're here today. Stay as long as you are able to stay. Having said that, we have four cases on. We'll call the first case, our argument, number 24-60199, United States versus, is it Joubert? See, I told my law clerks. They gave it some kind of other kind of pronunciation. I said, no, we're in New Orleans. It's probably Joubert. All right. You may approach. Thank you. Good morning. May it please the Court. Victoria McIntyre on behalf of the appellant, Justin Joubert. The ability to engage in speech that listeners find offensive, upsetting, disturbing, maybe even frightening, is a bedrock principle of the First Amendment. And this vigilance under the First Amendment is even more important when the speech is of this character, because when speech is disturbing or frightening or undesirable, this places a heavy thumb in favor of silencing the speech. Mr. Joubert was prosecuted entirely on the basis of his First Amendment protected speech, and the statute was accordingly unconstitutional as applied to him. Moreover, the statute that he was convicted under, 2261A, encompasses a substantial amount of protected speech relative to its legitimate scope. Therefore, it is unconstitutionally overbroad, and that provides an additional independent basis for dismissing the indictment against him. Because this Court can resolve the as-applied challenge only without getting to the overbreadth challenge, that's where I'll begin my argument. I think it's important to put in context the speech here in this case. All of the speech at issue occurred on the Internet, specifically Facebook, through interactions via likes, public posts that were made, and comments on public pages, the use of public images in all of that speech. When the government mentions following, that following is following on the Internet. It is following a public Facebook page. There is no physical following of anyone involved. This was all conduct that occurred online, on Facebook, while the defendant appellant was in a different state. And the majority of the Internet contains this kind of speech. The majority of the speech in the factual basis that Mr. Joubert pleaded guilty to is protected, clearly. You don't argue that just because it's in an electronic format that somehow the statute applies differently. The same argument you make, I take you would make it whether it was in the cyberspace or not. Certainly. I make the distinction only because I think when we use the terms following, for example, that evokes a physical following that's more akin to perhaps a physical stalking, or a stalking as we might generally know it, versus... Even people of my vintage, when you say following, you're talking about electronic. I appreciate that. I think sometimes it can be a little confusing, so I just wanted to make that point. What's the significance of the fact that he used Facebook accounts that were not under his name? Does that indicate he understood that the posts were threatening? I think if anything, that indicates that this was just a public ranting. The posts were made for, and the pages were made just for him to have a platform on the Internet. I don't think it indicates in any way that they were threatening. The true threat analysis that we have to consider, which is the only basis that the government is alleging that his speech was unprotected, that it falls under this true threat standard. Generally under Supreme Court and this Court's jurisprudence, you require speech that is specific, that it's direct, and that it's imminent, as opposed to being conditional or hypothetical. And none of the instances that Mr. Joubert pleaded guilty to, or as they were listed in the factual basis, meet these standards. I think considering the factual basis in total, most of the bases that were described by the government to justify the conviction were really just innocuous conduct. I mean, following a public Facebook page, that's not a crime. Interacting with a page via an emoji is clearly not a crime. That would be protected speech. The significance of several of the comments is that it was threatening. I don't think they fell. But the effect on the listener isn't the issue here. In order for a statement to be a true threat, we don't look to the effect on the listener. We look to an objective test in terms of whether, I think the Supreme Court encounterment most recently provided us with a definition that says that it's not what the statement conveys, not what the listener feels, or whether the statement is taken as a true threat. And so we don't doubt that a listener could have been fearful, and likely was fearful, but that's not the standard that we must consider when deciding whether the speech is protected or not. Context, which seems pretty front and center, pretty paramount in cases like this, is determining whether something is a true threat. Is that a factual question that ought to be resolved by a jury or by a district court in the first instance? I think in this case, the district court seemed to take that approach. This case was originally planning on going to trial, and so I think when the district court denied the motion to dismiss as applied, he indicated that he wanted more factual resolution, but I don't think that's necessary. He thought that was best reserved for a jury to make that determination based on the evidence at trial. Correct, but that's not required. I think if you look at the other cases, we have O'Dwyer, which was dealt with at the district court. We have, I believe, maybe Howell. There's plenty of cases that show us that you can dismiss the indictment as unconstitutional as applied when it's clear that whether it's a question for the jury or not, a district court can make that factual determination, and I think that was the case here. If you look at the statements as they've been alleged, that factual determination, it is factual, but it's based on a legal standard, and so the district court was the appropriate arbiter in that context to decide that none of the speech, as alleged, fell within. Some of our sister circuits, as you know, have rejected as applied challenges, as applied First Amendment challenges to the statute. How do Mr. Joubert's actions compare with the defendant's actions in those cases? In the other case, I don't, and maybe I'm not familiar with all of these, but in the cases that I've been able to review, the actions, or the speech at issue, also encompassed physical actions. So if you look at a lot of the other overbreath cases, for example, the threatening speech at issue is also accompanied by some kind of physical act, and the speech is clearly not protected, and I don't believe that it's dealt in the context of a true threat either. You have things like defamation, you have things like obscenity, you have call to criminal action, things that are clearly unprotected speech that are not like the threats, as the government alleges here. What motivated your client after 20 years to begin harassing the victim in his family? What set him off? I don't know. I believe that if you read the posts, as you do, I think it is clearly the rantings of a person who's been mistreated by another and by this Camp St. Stanislaus. I don't know that there was, and none of this is of record, I don't know that there was any kind of impetus or what it was, but I believe that it was an attempt to share with the public feelings of mistreatment by an individual as well as by the camp that this individual ran, and it was, that's what the First Amendment allows. We allow for this public airing of grievances. You find it in all different contexts online specifically where someone is upset for whatever reason, and they're making comments, they're making statements that we may find morally reprehensible, and I think we can agree that in this case the comments that were made are morally objectionable, but that doesn't mean that they're not protected. Well, he was fired from his job. Lots of people get fired. Sure. So it's 20 years later, as Judge Clements says, this surfaces, and then the venom is not just at the person who fired him, but at that person's family, to the father, to the daughter, to the children. So, I mean, that's, you know, however you may want to divorce the facts from, quote, the stalking, the cyber-stalking in the statute, you know, I think even a jury wouldn't have trouble following those facts, because it's not just directed at the individual who fired him. It's 20 years later, it's directed at that family member. Common sensically, one would say that's to harm the person who fired him by indirectly channeling this information, channeling their reputation. It's just sort of hard to get away from the facts. If you had a jury trial, maybe the jury wouldn't buy that, but he pleaded guilty, as was his right, which means that all the facts that are in there are undisputed. That's correct, but respectfully, I don't think that the timeline is relevant to our specific challenge. It may be different if we were making a clear sufficiency of the evidence challenge, but that's not the argument. We're not saying that the course of conduct as he pleaded guilty to, and of course we couldn't, he pled guilty, we're not saying that that doesn't fit within the statute. What we're arguing is that because the conduct as qualified under the statute was entirely comprised of speech, that... I think you're arguing somehow it should be some anesthetized, objective reading of animus. Well, I think that's what the Supreme Court mandates. I mean, Counterman gives us this definition, a true threat is a, quote, serious expression conveying that a speaker means to commit an act of unlawful violence, and that the effect on the listener is irrelevant to that analysis. Counterman says that this court's cases say that while, again, while morally objectionable, while perhaps frightening, that doesn't remove the speech from First Amendment protection, and if anything, it gives us more reason to protect that speech. We don't disagree with that. I mean, we're not even perceiving your argument. We're not taking effect in terms of what the listener felt or perceived, but just looking at the roles. That's not taking the viewpoint of how the mother or the daughter felt. That's looking at exactly what the channeling was in the cyberspace. That's viewing it in that perspective. And I agree that the context is key when considering these, whether speech is unprotected by virtue of true threats, but I still think if we look through the jurisprudence in this court and at the Supreme Court... Yes, it is. Sure. You said counterman. What's the best on-point case you have to support the argument of overbreadth of this statute? Well, I think we, in United States v. Young, the Third Circuit almost gets there, but it doesn't quite. They find that the statute clearly encompasses speech, and it can clearly be violated on the basis of pure speech, but they didn't have the benefit of counterman at the time of Young, and I think that counterman provides this court with an additional basis to invalidate the statute, because now we have counterman... Let me ask you a question in a different way. Assuming the panel were persuaded by you, articulate for me what the holding from this panel would be on your overbreadth channel. Tell me what that looks and sounds like. Sure. 2261A encompasses a substantial amount of protected speech relative to its legitimate scope. It is, therefore, unconstitutionally overbroad. The reason we get there today in... That's not what I meant. You just told me what the statute said. I said articulate for me what the holding, all our audiences would read, that this panel would say, taking these facts, state for me what the bottom line we would be holding in light of this. Don't tell me what the statute says. I'm asking you. It's your free shot. Well, that's the overbreadth definition right there, so that's why I started there. If you want to write an opinion, say, see definition. I think you might start there, but with counterman, we now say that if you have speech that would fall under the intent or harass prong of 22... The problem I'm having, I've asked you a beach ball question, and you have yet to tell me what the holding would be. That suggested to me that if you can't articulate it to me, then it's a stretch for me to embrace it. I don't say that I have it. You keep telling me what counterman says. You tell me what the statute says. I read all that before I got here, and I'm asking you, what is it if we do an opinion? What would the holding say in light of a guilty plea, this statute, cyber-syndrome? You just tell me what it is. The first, Mr. Joubert's conviction is in violation of the First Amendment because it was premised entirely on protected speech. Additionally, the statute is unconstitutionally overbroad because of an instance like this with Mr. Joubert where it can punish entirely protected speech. Why wasn't his conviction based not on his speech but on his conduct? He pleaded guilty to, in the words of the statute, a pattern of conduct composed of two or more acts. There's the factual basis for the conviction, which ticks off a whole bunch of acts that he took. And those acts, to me, they seem to be primarily conduct and not speech. I mean, certainly the content of some of the posts may be troubling, but I think taken together, Mr. Joubert's searching and posting and interacting and creating accounts and dot, dot, dot as a whole represents a pretty determined course of conduct to which he pleaded guilty. I see my time's up. If I can just respond to that question.  The conduct at issue is still, we argue, still encompasses speech because when you go out when you're interacting with a post, for example, when you're selecting an emoji or a like or a dislike, other circuits have, I don't know that this court has addressed it, but other than the creation of the Facebook accounts, it wasn't the creation of the accounts, it was the posts that were made on there that the government is taking issue with. And so all of the communications, whether they could be, and the government argues that this is conduct, it's all based on the expression that is conveyed and the effect on the listener, which the Supreme Court and this court has said is indicative of a content-based restriction and a conveyed expression which would encompass speech necessarily. Thank you. All right. Well, you've reserved your rebuttal time. Thank you. Thank you. All right. We'll hear from the government. May it please the Court and good morning, Your Honors. My name is . . . Were you trial counsel? Yes, Your Honor. Good. We love when we have a trial counsel here. All right. You've got all the answers to all the questions. I hope so, Your Honor. Press ahead. Thank you, Your Honor. As I said, my name is Lee Smith, and I, along with my co-counsel seated at the counsel table this morning, Jonathan Buckner, represent the United States in this case. For months, Mr. Joubert engaged in a course of conduct to harass and intimidate his victims, causing them panic and fear. Mr. Joubert accomplished this by creating multiple Facebook accounts, one being in the name of the victim. He did this by directly interacting with the victims on over 200 occasions. He did it by posting the address of where the victims used to live and where the victim currently works. He did it by posting photos of the victim, his wife, and his two minor children. And, ultimately, he did this by calling for the execution of the victim. It is Mr. Joubert's conduct that brings us before the court this morning. Now, there are three main issues raised before the court. First, 18 U.S.C. 2261 A2B is not overbroad. Second, it was Mr. Joubert's course of conduct that he was charged for, his conduct of intending to harass and intimidate the victims in this case. He was charged for that, and that is what he pled guilty to and admitted to doing. And, finally, to the extent that the statute or Mr. Joubert's conduct touches upon speech, his words are not protected, as they are true threats under the First Amendment. Let me One reason that he didn't do that is because Mr. Joubert was calling for the execution of him. He was posting where his minor daughters were going to be. He was saying things like none of this is going to stop until the casket drops. And so, for the victim to know exactly the steps that Mr. Joubert was taking, he allowed his Facebook page to remain open. Had he blocked Mr. Joubert from interacting with his Facebook page, he would be left to wonder, what is Mr. Joubert doing? He had called for his execution. Did he say, okay, on this day I'm traveling to Mississippi to go do that? The victim would not have known. Do you know what shut him off after 20 years? No, Your Honor, and that was very fearful to the victims in this case, because after 20 years of not interacting with Mr. Joubert, all of a sudden there are these Facebook posts calling for his execution, posting his minor children, and that led the victim to be even more fearful, because why is he doing this now, and what will he continue doing if we've had no interaction over the last 20 years? Today, Mr. Joubert asked this court to do something that no other circuit in the country has done, and that is apply the strong medicine of the overbreath doctrine and invalidate the cyberstalking statute. Because Mr. Joubert has not met his burden of showing that the statute is substantially overbroad, the last resort option of using the overbreath doctrine in this case should not be applied. As stated, multiple circuits have looked at this issue already, although the Fifth Circuit has not, and they come to the same conclusion, but they do so using different means or a different set of facts. For example, in United States v. Ackle, the First Circuit held that on its face the statute regulates conduct and not speech, therefore it is not overbroad. And they go further in saying that to the extent that the statute may touch upon speech, or that a prosecution may touch upon speech, an as-applied challenge is the appropriate remedy, not an invalidation of the entire statute. The Eighth Circuit and the Ninth Circuit in United States v. Petrovich and United States v. Ossinger, respectfully, they make the same conclusion, that the conduct is what's being regulated by the statute and not speech, and again, an as-applied challenge is the most appropriate course of action, not an invalidation of the statute. In the Eleventh Circuit and United States v. Fleury, the Court in the Eleventh Circuit held that again, the statute seeks to regulate conduct and not speech, but it goes further in the Eleventh Circuit holds that the statute narrows the type of conduct that can be prosecuted, and that narrowing, along with the plain reading of the statute, renders it not overbroad. And then finally, in the Third Circuit, that the appellate, Mr. Joubert, relies heavily upon, in this case, in its briefing, the United States v. Young case, the Third Circuit holds that the statute does touch upon speech, but the intent elements, the intent to harass or the intent to intimidate, narrows the statute in scope, rendering it not overbroad. So there are multiple avenues to get to a ruling that this statute is not overbroad, whether it be the plain reading of the text, or the narrowing of the type of conduct, or the narrowing by the specific intent elements. The other circuits that have held the statute as facially constitutional, which of those circuits has the reasoning that you think is the most compelling or forceful or airtight? United States v. Ackley, Your Honor, out of the First Circuit, who holds that on its face, it regulates conduct. And that pretty much ended their inquiry there, because that is what the statute seeks to regulate. And so that is our argument as well, is that the statute is regulating conduct on its face, and that if there is a prosecution brought that's not about conduct, that can be brought in an as-applied challenge. But as far as the overbreadth doctrine, it regulates conduct, therefore the inquiry ends there. Is the government required to prove that Mr. Joubert's posts were true threats? Or is it sufficient just to show that he engaged in a harassing, intimidating course of conduct? Yes, Your Honor. It is not our belief that he has to show that. We have to show true threats in this case. And that was our argument at the district court level as well. The Fifth Circuit has never required a showing of true threats for an 18 U.S.C. 2261 A2B prosecution. And while certainly not binding, the pattern jury instructions that we presented to the district court in this case do not require a showing of true threats. The reason that we articulated, as Your Honor asked earlier, about whether or not the district court should make a ruling about true threats is Mr. Joubert was originally charged in count two with a violation of 18 U.S.C. 875C, which would have required us to show true threats. And so that's where that discussion was on the record at the district court level. But for this prosecution, we believe we just have to show a course of conduct. And it is Mr. Joubert's conduct for which he was prosecuted and for which he pled guilty to. As the Supreme Court has held in Gibney v. Empire Storage and Ice Company, it has never been deemed an abridgment of the freedom of speech to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed. And that is exactly what we have in this case. We have a course of conduct, but merely because in some instances it was carried out through the use of speech, it does not render it illegal and it does not take it into a speech category. And so I want to talk about Mr. Joubert's conduct in this case. It started, as I mentioned earlier, he created six Facebook accounts. One of those accounts he used the name of the victim. He just added an extra letter to the victim's name. All six Facebook accounts. Where was he physically? I think the victims were in Mississippi, is that right? Yes, Your Honor. Where was Mr. Joubert geographically when all this transpired? He was in Louisiana, Your Honor, a couple of hours away. These six Facebook accounts were primarily used to post things about the victim and his family. He posted several other posts, but the primary focus of all six Facebook accounts were to target the victims. Mr. Joubert had to search for the victims' Facebook accounts to find them. He then had to interact with the victims on over 200 occasions. Mr. Joubert directly contacted the victim's wife and called her a derogatory term. Mr. Joubert was taking photos off of social media of the victim and his wife and or his two minor daughters and then reposting them onto one of his six Facebook accounts. For example, he posted a photo of just the two minor daughters themselves in their volleyball uniform and made a caption for it. Mr. Joubert had to search for where the victims lived. In fact, he found two different addresses for where they used to live, and then he had to repost them. He had to search for where the victim worked and for his phone number, and he posted that address and his phone number as well. He had to search for where the victims' minor daughters were in school and where they were playing sports. He interacted with those posts. Only the school's post indicating where the victims' minor children were going to be on a particular date, Mr. Joubert interacted with those social media posts. And ultimately, he did make threats in this case to carry out all of this conduct. But his process of searching for the victims, of taking their photos, of posting their addresses or posting his children, this is all a course of conduct, and that is what Mr. Joubert pled guilty to doing in this case. Reincarcerated now? Yes, Your Honor. Finally, to the extent that the statute does touch upon speech or that Mr. Joubert's conduct touches upon speech, his words are not protected as they are true threats. As already discussed this morning, the Supreme Court and countermen has made clear that true threats are not protected by the First Amendment. The court went on to say that the existence of a threat depends on what the statement conveys to the person on the other end, not necessarily what the person posting or the language that the person is using intends for. The government has to show a reckless standard for Mr. Joubert's post under true threats. And in this case, we have Mr. Joubert admitting to specifically intending to harass and intimidate his victims in order to cause them substantial emotional distress. And that specific intent meets the recklessness standard as set forth by countermen. So then we have to look at what did Mr. Joubert say and what would a reasonable person expect to do? And we can use a reasonable person in this case. We can look to what the victim actually did. So Mr. Joubert posted a picture of his victim and captioned it with, if you see this POS, execute him on sight. And I know there was some discussion a little bit this morning about there was no call to physical violence. He's posting an actual picture of the victim and saying, if anyone sees him, execute him. That is a call for violence. Mr. Joubert posted some song lyrics and said, 50 shots on, and they put the victim's last name and said that would be so easy. He posted to the victim, don't ever stop looking around your back. Mr. Joubert stated that none of this was going to stop until the casket drops, indicating that the victim would have to die. Mr. Joubert further posted, I can't wait to F you up. It's coming soon. Your life will cease too. He posted a photo, as I mentioned earlier, of the victim's two minor daughters, just them in the photo, and said, might just need to talk to these two, LOL. This continued to escalate until August 23rd of 2023, when Mr. Joubert posted a picture of the victim, his wife, and his two minor children in a photo together, and said, now that I have a picture of the family, he was thinking of becoming a serial killer, and went on to post about hopes that he keeps taking his Bipolar I meds. It's that escalation in context. It's the use of the word now that I have a picture of the family. Now is when I'm thinking of becoming a serial killer. I would point this court to the Second Circuit holding in the United States v. Dennis that is the subject of our second Rule 28J letter in this case, in which they found that similar words, you have yours is coming soon, don't stop looking around your back, that type of communication, in fact, was true threats according to the Second Circuit. Mr. Joubert's words are much more than that. There's actual calls to violence. We have a specific victim. We have specifically what he plans on doing to his victims, and that is a specific call to action against the victims. So how would a reasonable person react to these posts? Well, the victim in this case was terrified. He immediately went to local law enforcement. He bought a home security system. With that home security system, he had a panic button installed for his two minor daughters that they could push in case they ever were to see Mr. Joubert. That would send law enforcement to their home to protect them. He alerted his family to the existence of who Mr. Joubert was. He alerted his neighbors to Mr. Joubert, showing them a photo in case they ever saw him in the neighborhood. He brought a photo of Mr. Joubert to his minor children's school so they would have it in case Mr. Joubert ever showed up to his children's school. He and his wife, the victim and his wife, rearranged their daughters' daily schedules in order to make sure that they were accounted for at all times so that they would be protected from Mr. Joubert. The victim was clearly terrified in this case, and a reasonable person would be as well. A reasonable person pulling up Facebook, seeing a photo of themselves with a caption of would be fearful that something is going to happen, especially when this continues for months without any stopping. It is because of this statute that this type of conduct finally stopped in this case. After the August 23, 2023 post by Mr. Joubert, the victim went to the FBI, and that is when a criminal complaint was filed on August 28, 2023. This statute being in place allowed the victim to seek help from the federal government and allowed for himself to get peace for his family and for this type of conduct to stop. An invalidation of this statute today would have rendered this victim and would-be victims helpless to see posts online that somebody may very well execute them, and without this statute they are left to sit and wait and see if it actually happens or not, and that is the heart of what is before this court this morning. I see that I have about three minutes left. Are there any other questions from the court? Thank you, Your Honors. All right, Counsel, you have your rebuttal time in check. Thank you, Judge. Counsel, for the government brings up, in this case, these were public pages. I think it's disingenuous to say that the reason why they didn't block Mr. Joubert was because they wouldn't be able to view his posts. I mean, if these are public pages, they could specifically block contact from him, and law enforcement would still be able to monitor this activity. They could make a fake Facebook account, just like he did. It's not that his activity would be hidden because they blocked him, and it could have helped him stop sending direct communications to them. I think the other issue here is that the other circuit cases weren't faced with facts like this case, where the entirety of the criminal conduct was based on speech, and when counsel for the government says that these victims wouldn't have had any recourse, they could have proceeded under 875C, the threat statute, as part of the guilty plea. Mr. Joubert only pleaded guilty to 2261. It's often the case that the government has numerous tools in its toolbox from which to charge behavior. On the one hand, you don't want them charging with every possible statute, so the fact that they chose this one, I mean, it's just the prosecutor's choice, right? I agree, and it's not that other methods wouldn't be available to them if 2261A, which doesn't directly apply here, was not one of those options. And there are civil options as well. They could have received some kind of restraining order. Those should not be. It seems they had a cart backwards. I mean, the government chose to charge, so let's stay with that. Now what they could have done. What's your response to the 28J U.S. v. Dennis? He just said he found that that being sort of closer, apropos, whatever. If you found a response, I might have missed it. I did, but the distinction there being that in that case, we have facts that say the defendant sent, quote, thousands of electronic commissions directly to one of the victims, which is different than the facts we have here. He also explicitly threatened him with physical harm, and there was a reference in those communications to. In the axiomatic, every case we get is different. So, I mean, it's not an answer to say it was different. All of them are different, only facts. Even if they had the same name, they're different. Of course. So the defining helped me understand how, yes, the facts are different, but what's the qualitative distinction in terms of the legal holding in the case from not the facts, they're going to be different, but what's the qualitative difference between the holding in Dennis and as the government has argued here? Well, different from the circumstances here, the threats in that case were true threats because they were specific, they were direct, and they weren't conditional. And those are the three groups. What's qualitatively different about that than the seriatim that he just gave us of all the stuff that Mr. Juba did? I mean, come on. Well, I think if you look, I think the government's version and characterization of the facts is different than that in the record and is also – I'm not pushing back on you because I'm an advocate. I'm just trying to pull out of you beyond giving me sort of an answer off those pages. I want you to look me in the eye and give me a real answer to push back, not what you wrote down. I was looking at this. Yeah, I know, but you give me a can answer. I'm saying he just gave us old litany of all the things that your client, quote, pled guilty to. This is coming to us from a guilty plea, not from a jury trial where we have an issue with a fact. So all the facts are here. So he just gave us a litany. So I'm just asking you to tell me qualitatively why the recitation of facts here is so distinct or different from Dennis or the other cases that it would make the legal holding different. Because the facts here encompass entirely speech, which is different than Dennis and is different than the other cases. But he just gave us an argument about all the course of conduct. How do you divorce the course of conduct? I mean, that's, I think, your big hurdle here. How can you divorce the course of conduct that's just laid out? He just gave us a litany of all the things he did. That's conduct. That's not the speech part. What do you do with that? But I think the only even alleged conduct would be the creation of a Facebook page. Everything else has to do with speech. And the issue here isn't, again, it's not sufficiency. It's the fact that this is an action to take their pictures and stick them over here, to take this, to stick them over here. That's not speech. That's an action he took. But they have criminalized not that physical taking. They've criminalized the post that accompanies the picture. And, again, a publicly available picture. And so it's not that they're – and I think we could all agree that taking a public picture – Give her an extra minute. I'm not going to ask a question. I'm a letter. I have one too, but you – No, no, no. Give her two minutes. We're not – I mean, you guys are in jail a lot of time. Give her an extra two minutes. I will cease and desist. Well, I just want to piggyback on Judge Stewart's question. And it's just this dividing line between a conviction based on a course of conduct to which your client pleaded guilty, a course of conduct he engaged in to stalk and intimidate and harass. And, at least to me, I'm drawing a distinction between that course of conduct and the contents of his social media posts. To me, it's not the content of the posts that are troubling. It's that your client made these posts to demonstrate to MR that he knew where his daughters were and that he could hurt them. And it's harassing regardless of the content, your response. The distinction that we're making here is not that this doesn't fall within conduct so as to satisfy 2261A. And, again, he did plead guilty. But it's the fact that the conduct at issue, whether it does create this course of conduct intended to do X, each of the occasions are premised entirely on speech. And so that's why we've argued that it's a First Amendment violation rather than a sufficiency argument because when you look at each of the pieces of this conduct, they all encompass speech, which is protected. And because there has been no showing that they fall within true threats, considering each individual occasion of speech, it can't be a constitutional conviction. That's the distinction we're drawing. All right, counsel. You have ably represented your client, both in brief and at the podium, and for that we appreciate it. Counsel for the government, likewise. The case is brief. We'll take the case as submitted. We'll get it decided soon. Thank you both. You may be excused. All right.